BENTLEY W. WARREN & others vs. THE BOSTON NATIONAL BANK.

Norfolk.   March 16, 1925. — May 22, 1925.

Present: RUGG, C.J., PIERCE, CARROLL, WAIT, & SANDERSON, JJ.

*Agency*, Existence of relation.  *Attorney at Law.*  *Corporation*, Officers and agents.  *Banks and Banking.*  *Contract*, Validity, Implied.  *Practice, Civil*, Verdict.

It is not an abuse of discretion for the judge presiding at a trial, after retirement by the jury at the close of the charge and following a discussion with counsel in which counsel urged that some points of law were not made plain to the jury, to recall the jury and, among other instructions, to submit to them a special question presenting the principal issue in controversy at the trial.

The evidence, at the trial of an action by a firm of attorneys at law against a national bank for compensation for services alleged to have been rendered in connection with arranging for the taking over by the defendant by legal and lawful methods of a trust company whose property and business were in the possession of the commissioner of banks, was *held* to warrant an affirmative answer by the jury to a special question, submitted to them by the judge, whether the president of the defendant engaged the services of the plaintiffs and whether his action in so doing was ratified by the defendant's board of directors.

Neither the legality of the employment of the plaintiffs in the action above described nor their right to recover for their services rendered was affected by the facts that the consolidation sought to be accomplished through their advice and under their direction could be made only when agreed to by a majority of the board of directors of each bank and when ratified and confirmed by the affirmative vote of the shareholders owning two thirds of its capital stock at a duly called meeting, and that an increase in capital stock of a national bank might be made only by the vote of shareholders owning two thirds of the stock of the association.

It appearing that the ultimate result sought to be accomplished by the defendant through the advice and under the direction of the plaintiffs in the action above described was the consolidation of national banks and the absorption of the trust company with the approval of the comptroller of the Federal treasury, it could not be ruled as a matter of law that the proposed scheme was *ultra vires* as to the defendant because it was an undertaking to guarantee the depositors of the trust company a certain agreed percentage on their deposits, and thus to pay the debts of another.

It appeared that one plan submitted to a single justice of this court by the plaintiffs as attorneys for the defendant in proceedings relating to the trust company, whose property and business were in the possession of the commissioner of banks, was not approved by the justice. *Held,* that, at the trial of this action for the plaintiffs' services, the reasons given by the single justice for his action were properly excluded as evidence.

The plan so submitted by the plaintiffs to the single justice was *held* to show no common law or statutory illegality, and no taint of moral turpitude to prevent recovery for the value of the plaintiffs' professional services.

There were two counts in the declaration in the action above described, the first upon an account annexed claiming compensation for the services in question in the sum of $3,000, and the second containing allegations of employment of the plaintiffs and refusal by the defendants to pay for services rendered, "All to the great damage of the plaintiffs as in their writ alleged." The *ad damnum* of the writ exceeded the amount of the account annexed to the first count. The plaintiffs contended that the jury might find that their services were worth more than the $3,000 they had claimed, and the judge left that question to the jury, who found for the plaintiffs in a sum greater than $3,000. *Held,* that the finding by the jury showed no error.

CONTRACT, by the law firm of Warren, Garfield, Whiteside, and Lamson, with a declaration in two counts. Writ dated March 29, 1922.

The first count of the declaration was upon an account annexed for a balance of $3,288.24 for services and disbursements, only two items of which finally were left to the jury, namely, for services "In connection with taxes assessed by the city of Boston on capital stock of the bank for the year 1921; advice and opinion as to validity of tax, paying same under protest and bringing suit against the city of Boston for recovery," and for services "In connection with proposed purchase of Hanover Trust Company." The second count alleged that the defendant "employed the plaintiffs to furnish legal advice and services. The plaintiffs thereafter while so employed in the service of the defendant and at the defendant's request gave legal advice and prepared documents of various kinds, in connection with a certain proposed purchase of the Hanover Trust Company, and other matters, and did many other things in the course of such employment. The legal services so rendered up to February 1, 1922, were of great value to the defendant. On or about February 1, 1922,

the plaintiffs duly demanded from the defendant in payment for the said legal services a sum well within the amount that the said legal services were reasonably and fairly worth but the defendant refused and still refuses and has wholly failed to pay the plaintiffs in whole or in part for the said legal services so rendered at the defendant's request. All to the great damage of the plaintiffs as in their writ alleged."

In the Superior Court, the action was tried before *Irwin,* J. Material evidence and the substance of the contentions of the defendant at the trial, which the judge overruled subject to exceptions by the defendants, are described in the opinion.

In his charge, the judge instructed the jury, "the plaintiff by his counsel has ably argued that the second count of the declaration which recites — 'And the plaintiff says that the defendant is a corporation duly organized under the laws of the United States, and that it employed the plaintiffs to furnish legal advice and services'; by that count, which will go to the jury room with you, the plaintiff urges upon you that you are not bound by the $3,000 item that is presented by the plaintiff in his bill; that you should decide from the evidence that his bill was too modest, too small; that on the evidence he is entitled to more than the $3,000 item. That goes to the jury room with you as an issue."

After the jury had retired, following the charge, there was an extended discussion between counsel for the defendant and the judge upon requests by the defendant for rulings; and, among other contentions, the counsel for the defendant alleged that certain instructions were not made clear to the jury. The jury then were recalled and, among other questions, the judge left with them the following specific question: "Did Mr. Stetson, president of the bank, engage the services of the plaintiffs, and was his action in so doing ratified by the board of directors?"

The jury answered the special question in the affirmative and found for the plaintiffs in the sum of $4,320. The defendant alleged exceptions.

*Lee M. Friedman,* for the defendant.

*J. L. Hall,* (*A. Whiteside & M. Jenckes* with him,) for the plaintiffs.

PIERCE, J.  This is an action of contract, tried before a judge of the Superior Court and a jury, to recover the value of professional services rendered and certain disbursements expended on behalf of the defendant.  The declaration is in two counts, an account annexed and a *quantum meruit*. The jury found for the plaintiffs, and the case comes before this court on the defendant's exceptions.  The defendant submitted fifty written requests for rulings.  Thirty-two exceptions were taken to parts of the charge.  Exceptions were taken to the failure of the trial judge to give certain requests, to certain comments by the judge upon the requests given, and to the admission and exclusion of certain testimony.

The pertinent facts are in substance as follows:  The defendant was organized with an authorized capital of $200,000 and opened for business February 1, 1921.  The plaintiff Whiteside was a stockholder, became a director and acted as such for the whole period in which the matter here in controversy occurred.  The principal item involved is a charge for professional services in connection with a project to take over the Hanover Trust Company, which was at the time in the bank commissioner's hands.  Before April 28, 1921, the discount committee of the Boston National Bank, consisting of the president, two vice-presidents, three members of the board of directors and three members of the board who served for a month and then were replaced by three other members (in all nine members of the board of directors consisting of twenty-three members) had under consideration the proposition that the bank should purchase the assets of the Hanover Trust Company.  A committee of the discount committee, acting upon the suggestion of the State bank examiner, entered into negotiations with the bank commissioner of Massachusetts and the board of directors and members representing the Hanover Trust Company.  The plan of the committee was to establish a branch bank of the Boston National Bank in the office of the Hanover Trust Company.

At that time there was no national bank in Boston that had a branch, although there were a number in New York

and other places.   The United States law made it difficult
to have branches.   To accomplish this result it was necessary
that the impairment of the capital stock of the trust company
should be made good; that it should be reopened and with
the consent of the bank commissioner have a branch.   Then,
after it had been established as a going trust company with
a branch, it was necessary for it to turn itself into a national
bank with a branch, and it could consolidate with or sell itself
to the Boston National Bank; then the Boston National
Bank would have all its assets, would have its branch, and
would continue to operate as a national bank with a branch.

On April 28 the president of the bank, speaking to the
discount committee, stated "that the matter was enormously
complicated on the legal side," that he could not hope to
proceed at all without the advice of counsel, and that so far
as he could see they would have to use Mr. Whiteside as he
was the only counsel in Boston who had had a similar ex-
perience with a consolidation or purchase of assets of other
banks.   On April 28, 1921, the president called at the office
of Mr. Whiteside and said he had been discussing for several
weeks with the bank commissioner the possible purchase of
the Hanover Trust Company; that he had reached a point
in his negotiations where he felt the transaction would go
through, and he wanted Mr. Whiteside to act as counsel for
the bank in the matter.   "He said it would involve some
financing, and he wanted to accomplish it in such a way as
to give the Boston National Bank the best possible standing
in the matter before the community.   He said he believed
it was of very great advantage to the community to have
another of these closed trust companies opened, and the
depositors given a chance to get their money, particularly
the savings depositors, and he thought that it would not
only result in increased deposits to the Boston National
Bank but it would save a good many of the deposits of the
Hanover Trust Company and would be the best possible
advertisement for the Bank, and he wanted . . . [Mr. White-
side] to assist in that end of the matter, as well as the
legal end."   Mr. Whiteside and his partner Mr. Garfield im-
mediately gave their attention to the many complicated

questions involved, they had numerous conferences with the bank commissioner, his special counsel Mr. Wyman, the liquidating agent of the Hanover Trust Company, the counsel for the Irving National Bank, the president of the First National Bank of Boston, the comptroller of the currency in Washington, many meetings with the directors and stockholders of the defendant bank, conferences with representatives of the Hanover Trust Company and various informal hearings in court.

At this time the Hanover Trust Company had been closed for many months and was in process of liquidation, a good part of its assets had been liquidated, there was between $1,000,000 and $2,000,000 in cash. It had deposits of about $3,000,000, and its assets in paper were somewhat larger. It might pay its savings deposits in full but not its commercial deposits, dollar for dollar. The capital stock of the Hanover Trust Company was not worth its par value; it had been entirely wiped out, "the stockholders were not going to get a single cent." The plaintiffs conceived a plan whereby the purpose of the defendant bank to purchase the assets of the Hanover Trust Company and re-establish it with a branch could be accomplished. This conception necessitated that the bank commissioner should file a petition in the Supreme Judicial Court and be authorized to sell all the assets and property of the Hanover Trust Company to the committee representing the Boston National Bank, in accordance with an agreement with said committee, by reference incorporated in the petition. The agreement dated July 15, 1921, in terms subject to a decree of the Supreme Judicial Court approving the plan and the sale, conveyance and transfer to the committee, the approval of the comptroller of the currency of the United States, and upon the resignation of all officers and directors of the Hanover Trust Company, was executed in triplicate by the Hanover Trust Company, by the commissioner of banks, the executive committee of the Boston National Bank, and the Boston National Bank by its president. This agreement, which never went into effect because it never received the approval of the Supreme Judicial Court, provided

in substance that the bank commissioner was to sell all of the assets of the Hanover Trust Company to a committee of the Boston National Bank; that the Boston National Bank was to assume and guarantee the payment of the obligations of the Hanover Trust Company, first, paying all the savings deposits and the Christmas Club in full, second, all taxes in full, third, the expenses of the liquidation of the Hanover Trust Company, fourth, sixty per cent of all the commercial deposits and other liabilities of the Hanover Trust Company.

Subsequently the plaintiffs prepared a new agreement in substitution of the unapproved agreement of July 15, 1921, wherein the guaranty of the payment to the Hanover Trust Company's commercial depositors and general creditors was reduced to fifty-one per cent, and the Boston National Bank agreed to increase its capital by an additional $100,000. The Hanover Trust Company stockholders' liability which the former agreement had transferred to the buyer was to be retained by the bank commissioner and there were other lesser and minor changes. This last agreement was never executed, through no default of the plaintiffs but because of a change in the control of the defendant bank and the discharge of the plaintiffs from further service in this regard. There was evidence that the plaintiffs' services were of the value of not less than $5,000.

At the close of the evidence, after the arguments and charge to the jury, the judge submitted to the jury the question, "Did Mr. Stetson, president of the bank, engage the services of the plaintiffs, and was his action in so doing ratified by the board of directors?" The jury answered the question "Yes," and returned a verdict for the plaintiffs in the sum of $4,320. The judge did not abuse the discretion vested in him by submitting the question after the arguments and without further instructions, as the defendant contends. The jury are commonly asked to answer after verdict questions as to the ground of their verdict and of course in such a case without arguments and without instructions directed particularly to the form of the question. *Spurr* v. *Shelburne,* 131 Mass. 429. *Burke* v. *Hodge,* 211 Mass. 156. *Cotter, petitioner,* 237 Mass. 68.

The first point involves the issue whether there was evidence to warrant the submission of the question of fact to the jury.  We think there was.  At a meeting of the discount committee, the duties of which were to "conduct the business of the Bank when the Board of Directors shall not be in session," held on April 26, 1921, the president stated that he had to have legal assistance in connection with the Hanover Trust Company matter, then under discussion.  At that meeting or at a meeting held April 28, he stated that ". . . [they] would have to use Mr. Whiteside because so far as . . . [he] knew . . . [Mr. Whiteside] was the only counsel in Boston who had had a similar experience with a consolidation or purchase of assets of other banks."  As a result of action taken by the committee the president employed Mr. Whiteside as above stated; and Mr. Whiteside and his partner Mr. Garfield agreed to act as counsel for the bank.

The next contention of the defendant is that the action of the board of directors was beyond their power because the plan contemplated a consolidation of national banks which could be made only when agreed to by a majority of the board of directors of each bank, and when ratified and confirmed by the affirmative vote of the shareholders owning two thirds of its capital stock at a duly called meeting; and that an increase in capital stock of a national bank may be made only by the vote of shareholders owning two thirds of the stock of the association.  Act of November 7, 1918, c. 209, §§ 1, 2;  40 U. S. Sts. at Large, 1043, 1044.  Act of May 1, 1886, c. 73, § 1; 24 U. S. Sts. at Large, 18.  Barnes Federal Code, [1919] 2510, 2183.  The answer to this position is that the necessity for such an approval by stockholders does not arise until there is a plan which has been worked out in detail; that it is the duty of the directors to provide such a plan for submission to the stockholders, and, in connection therewith, to ascertain the ways and means necessary to be observed and provided, subject however to the approval of the stockholders.

It is next contended that the proposed scheme was *ultra vires* because it was an undertaking "to guarantee the de-

positors of the Hanover Trust Company a certain agreed percentage on their deposits," and thus to pay the debts of another.   We assume with the argument of the defendant that the ultimate result contemplated by the plan was the consolidation of the national banks.   When approved by the comptroller of the currency there is nothing illegal, nothing contrary to the statutes, and nothing *ultra vires* in such a consolidation.   *Hightower* v. *American National Bank of Macon,* 263 U. S. 351, 357.   The guarantee was the amount of the consideration to be paid the Hanover Trust Company for the sale of its assets and business measured by what should turn out to be the difference between the liquidated assets of the Hanover Trust Company and the amount which the trust company owed its depositors, upon a percentage basis.

We find in the plan submitted to a justice of this court no common law or statutory illegality, and no taint of moral turpitude to prevent recovery for the value of the plaintiffs' professional services.   There was no error in excluding what the justice of the court said as his reason, or as one of his reasons, for not approving the agreement submitted to him. That reason may have been sound or otherwise.   His full duty was performed when he allowed or rejected the agreement without the assignment of reasons.

The evidence reported is ample that the board of directors knew that Stetson had employed Mr. Whiteside to act as counsel; that they knew that Mr. Whiteside expected to be paid for his services; and that such services were not rendered or received in the performance of duties incidental to the office of director.   We think in the light of all the evidence the jury could properly find that the record of the board of directors was an approval of the hiring of the plaintiffs by Stetson, as well as of the action of Stetson in entering into and executing the agreement dated July 15, 1921, which Mr. Whiteside had devised.   We also think that the stockholders' vote was a ratification of the acts of Stetson so far as such acts related to the preliminary work of negotiation and formulation of the proposed agreements with the Hanover Trust Company and the commissioner of banks.

We find no reversible error arising from the treatment of the defendant's fifty requests for instructions. All that were not given and are discussed in the defendant's brief are dealt with in the opinion.

There was no error in the fact that the verdict of the jury is larger than the total claimed in the account annexed, or in the count in *quantum meruit*. If a contract price had been set, such an agreement would not limit the amount of recovery when, as here, the contract is broken without fault of the plaintiff and he sues for the value of the services rendered. *Dalton* v. *American Ammonia Co.* 236 Mass. 105, 108. The amount found does not exceed the *ad damnum* of the writ, and there was evidence to warrant a finding that the value of the services rendered and received was in fact in excess of the verdict returned, even if the jury rejected all claims other than for professional services in connection with the Hanover Trust Company agreement for consolidation.

*Exceptions overruled.*